No. 49,993

CHEE-CRAW TEACHERS ASSOCIATION, *Appellee,* v. UNIFIED SCHOOL
DISTRICT NO. 247, CRAWFORD COUNTY, KANSAS, *Appellant.*

(593 P.2d 406)

Opinion filed March 31, 1979.

*David Mullies,* of Hudson, Hudson & Mullies, of Fort Scott, argued the cause
and was on the brief for the appellant.

*Patricia R. Griffin,* of Crane, Martin, Claussen, Hamilton & Barry, of Topeka,
argued the cause, and *Wesley A. Weathers,* of the same firm, and *C. A. Menghini,*
of Menghini & Menghini, of Pittsburg, were with her on the brief for the appellee.

The opinion of the court was delivered by

MCFARLAND, J.: This appeal involves a dispute between Chee-
Craw Teachers Association (hereinafter referred to as Associa-
tion) and Unified School District No. 247 (hereinafter referred to
as Board), arising from their professional negotiations for the
1978-79 school year.

The Association is the professional employees' association duly
authorized to collectively negotiate with the Board on behalf of
the teachers of U.S.D. 247. On December 1, 1977, the Board and
the Association, pursuant to K.S.A. 1978 Supp. 72-5423, ex-
changed notices of items to be negotiated for the 1978-79 school
year. On January 20, 1978, the Board advised the Association that
it considered nineteen of the proposals, in whole or in part, to be
"non-negotiable" items. On March 8, 1978, the Association
brought an action against the Board seeking a temporary injunc-
tion to require the Board to enter into good faith negotiations and,
upon the merits, a permanent writ of mandamus. The Board
responded with a motion to dismiss based on procedural irregu-

larities (stated in detail later in this opinion). On March 20, 1978, the Association's application for a temporary injunction and the Board's motion to dismiss were heard. On the following day the trial court entered its memorandum decision denying the motion to dismiss, determining which proposals were or were not mandatorily negotiable, and temporarily enjoining the Board to negotiate in good faith those proposals the court had found to be mandatorily negotiable. The temporary injunction was to remain in effect until a hearing was had on the mandamus action. The Association was required to file a $500.00 surety bond, pursuant to K.S.A. 60-905. The Board duly filed its notice of appeal from the portions of the court's decision adverse to it. Subsequently, upon motion of the Board and conditioned upon the Board's filing a $500.00 supersedeas bond, the temporary injunction was suspended, pending this appeal, except for certain proposals.

Numerous points of error are raised on appeal. The first category of claimed error relates to the denial of the Board's motion to dismiss. The Board contends the petition seeking, among other things, that a temporary injunction be issued, was fatally defective because it was not verified as required by K.S.A. 60-902. The statute provides:

"When it appears by a verified pleading or affidavit that a party is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce injury to a party; or when during the litigation it appears that a party is doing or threatens or is about to do, or is procuring or suffering to be done, some act in violation of a party's rights respecting the subject of the action, or tending to render the judgment ineffectual, an order may be granted to restrain such act."

The Association contends it was not seeking an ex parte restraining order pursuant to K.S.A. 60-902, but was requesting a temporary injunction pursuant to K.S.A. 60-905, which states:

"(a) *Notice and hearing.* No temporary injunction shall be granted until after reasonable notice to the party to be enjoined and an opportunity to be heard.

"(b) *Bond.* Unless otherwise provided by statute, no temporary injunction shall operate unless the party obtaining the same shall give an undertaking with one or more sufficient sureties in an amount fixed by the judge and approved by the clerk of the court, securing to the party injured the damages he or she may sustain including attorney fees if it be finally determined that the injunction should not have been granted."

The temporary injunction was issued after a hearing with both

parties represented. This was not an ex parte procedure under K.S.A. 60-902, but was an action under K.S.A. 60-905. The petition was not required to be verified. The point is without merit.

The next point of claimed error in denying the Board's motion to dismiss is that service of process of the petition was improper. K.S.A. 60-304(d) provides that service upon the school district shall be made by serving the clerk of the board. The clerk was absent from her office when the process server arrived. The superintendent of schools talked to the process server when he was delivering the summons. The superintendent knew the nature of the served papers and mailed copies of them to each member of the Board the following day. Nothing is to be gained by reciting any further details of the service, return of summons, or amended return of summons.

The Association calls this court's attention to K.S.A. 60-204, which provides:

"The methods of serving process as set forth in article 3 of this chapter shall constitute sufficient service of process in all civil actions and special proceedings, but they shall be alternative to, and not in restriction of different methods specifically provided by law. In any method of serving process, substantial compliance therewith shall effect valid service of process if the court finds that, notwithstanding some irregularity or omission, the party served was made aware that an action or proceeding was pending in a specified court in which his or her person, status or property were subject to being affected."

There is no showing of prejudice by the particular means of service. This point is without merit.

The next category of claimed error relates to the district court's failure to state the controlling facts in its determination as required by K.S.A. 60-252(a), and the legal principles controlling its decision as required by Supreme Court Rule No. 165 (223 Kan. lxx). The challenge to the ruling is first made on the motion to dismiss which was denied without elaboration in the written decision. Neither the statute nor the Rule (both above-cited) apply to denials of motions to dismiss. It is noted further that, whereas the written memorandum decision does not state the controlling facts or legal principles, these were stated orally by the district judge at the March 20, 1978, hearing, and such oral statements were sufficient to satisfy legal requirements. The point is without merit.

The same challenge is made next as to the determination of what proposals were or were not mandatorily negotiable. The

memorandum decision has been carefully reviewed and is sufficient to advise the parties of what is being decided on each proposal, as well as the legal basis for the decision. This conclusion as to the sufficiency of the district court's memorandum decision is further buttressed by a later portion of our opinion herein, dealing with obligations and duties of district courts in determining what is or is not mandatorily negotiable in Board-Association disputes. The point is without merit.

We proceed now to the category of alleged error relating to the district court's determination as to whether particular proposals were or were not mandatorily negotiable. Before taking up the individual topics in dispute, we need to establish some rules for determination of the scope of mandatory negotiations.

In 1970 the legislature enacted the Collective Negotiations Law (K.S.A. 72-5413 *et seq.*). In K.S.A. 72-5413(*g*) the following definition appears:

" 'Professional negotiation' means meeting, conferring, consulting and discussing in a good faith effort by both parties to reach agreement with respect to the terms and conditions of professional service."

In 1976 and 1977 the statute was amended, but the amendments did not alter the section above-cited.

In *National Education Association v. Board of Education*, 212 Kan. 741, 512 P.2d 426 (1973) (commonly referred to as *Shawnee Mission*), this court was confronted with the question of what topics were negotiable within the phrase "terms and conditions of professional service." Therein it was held certain specific topics were included within the phrase and the "impact test" was adopted. In *NEA-Topeka, Inc. v. U.S.D. No. 501*, 225 Kan. 445, 592 P.2d 93 (1979), we held that when the 1977 legislature amended K.S.A. 72-5413 to define "terms and conditions of professional service" it simply made statutory law out of the judicial determination of the scope of professional negotiations set forth in *Shawnee Mission,* but deleted three items from the list in *Shawnee Mission*—namely, probationary period, transfers, and teacher appraisal procedures.

It is interesting to note that in *Shawnee Mission* individual proposals were not set forth and only topics were designated. Apparently, this approach worked satisfactorily (based on the absence of litigation thereon) until the 1977 legislature made statutory law of the *Shawnee Mission* determination, as afore-

mentioned, with the enactment of K.S.A. 1978 Supp. 72-5413(*l*) as follows:

" 'Terms and conditions of professional service' means salaries and wages, hours and amounts of work, vacation allowance, holiday, sick and other leave, number of holidays, retirement, insurance benefits, wearing apparel, pay for overtime, jury duty, grievance procedure, disciplinary procedure, resignations, termination of contracts, matters which have a greater direct impact on the well-being of the individual professional employee than on the operation of the school system in the school district or of the community junior college and such other matters as the parties mutually agree upon as properly related to professional service. Nothing in this act, or the act of which this section is amendatory, shall authorize the adjustment or change of such matters which have been fixed by statute or by the constitution of this state."

The same 1977 legislature enacted K.S.A. 1978 Supp. 72-5426 *et seq.*, commonly referred to as the "school impasse" legislation, which is not directly involved herein. For reasons not discernible, some teachers' professional employees' associations and school boards have interpreted the enactment of K.S.A. 1978 Supp. 72-5413(*l*) as the creation of a "new ball game." As a result, numerous legal actions have been commenced by various professional employees' associations to compel negotiations on, collectively speaking, a wide variety of specific proposals. Associations and school boards seem to have abandoned the topic concept (except where favorable to one or the other's respective positions) and insist the mandatory negotiability of each particular proposal in dispute be determined individually on a case-by-case basis, and that such determination be based upon the evidence introduced in each particular case. Since all, or virtually all, judicial districts have more than one unified school district within their boundaries, this rationale could have the absurd result of the same district judge reaching different conclusions within a close proximity of time on identical proposals involved in the negotiations in different unified school districts. Under this rationale, a particular proposal in a particular unified school district could even be judicially determined to be not mandatorily negotiable one year and an identical proposal submitted in the same unified school district the following year could be held to be mandatorily negotiable by virtue of change in the evidence presented. Under this concept the scope of negotiations would require judicial determination each year in each school district as there would be no established rules on which the parties could

rely. If this were in fact the law, then a recent article on the subject of teachers' collective negotiations (Babcock & Kauffman, *Impasse in Wonderland: Some Ramifications of the 1977 Amendments to the Kansas Collective Negotiations Act,* 18 Washburn L.J. 11 [1978]) began with what would be a highly appropriate quotation from *Alice in Wonderland,* as follows:

"Alice thought that she had never seen such a curious croquet-ground in all her life: it was all ridges and furrows: the croquet balls were live hedgehogs, and the mallets live flamingos, and the soldiers had to double themselves up and stand on their hands and feet, to make the arches.

"The chief difficulty Alice found at first was in managing her flamingo: she succeeded in getting its body tucked away, comfortably enough, under her arm, with its legs hanging down, but generally, just as she had got its neck nicely straightened out, and was going to give the hedgehog a blow with its head, it *would* twist itself round and look up in her face, with such a puzzled expression that she could not help bursting out laughing; and, when she had got its head down, and was going to begin again, it was very provoking to find that the hedgehog had unrolled itself, and was in the act of crawling away: besides all this, there was generally a ridge or a furrow in the way wherever she wanted to send the hedgehog to, and, as the doubled-up soldiers were always getting up and walking off to other parts of the ground, Alice soon came to the conclusion that it was a very difficult game indeed."

For "Alice" the lack of established rules for the game's participants made the whole affair a mass of confusion. This same lack of established rules would destroy the intent of the Collective Negotiations Law.

In *NEA-Topeka, Inc.,* 225 Kan. 445, an "impasse" had been declared more than a month prior to the time a declaratory judgment was entered determining what was or was not mandatorily negotiable. Yet, one facet of the "impasse" was the dispute over what was or was not mandatorily negotiable. Effective utilization of impasse procedures is impossible until the "square one" issue of what proposals the parties are required to negotiate has been resolved.

The intent of the 1977 amendments to the Collective Negotiations Law, K.S.A. 1978 Supp. 72-5413 *et seq.,* was to statutorily define the scope of mandatory negotiations and to provide the impasse procedure as a tool to assist in reaching a negotiated agreement. K.S.A. 1978 Supp. 72-5426(*a*) requires the district court to hear an impasse petition within five working days of its filing. Short time limits are required for the various procedures to be followed once an impasse has been declared (K.S.A. 1978

Supp. 72-5427 *et seq.*). A speedy resolution of the impasse is the goal of the legislation. This all goes for naught if the basic issues as to what must be negotiated are not determined prior to declaration of impasse. In *NEA-Topeka, Inc.,* 225 Kan. 445, more than half the school year on which the parties were negotiating had elapsed before this court determined the scope of negotiations. An even greater percentage of the school year will be concluded before this case is determined. Even the sanctions section (K.S.A. 1978 Supp. 72-5430) is materially affected by delay as one side cannot be guilty of the prohibited practice of refusing to negotiate in good faith on proposals where there is a good faith dispute as to whether items are mandatorily negotiable. Inasmuch as negotiated agreements are "package deals," it is often difficult or impossible to make progress in negotiations while key proposals are involved in litigation as to whether they are mandatorily negotiable.

In order to effectuate the intent of the Collective Negotiations Law it is imperative to break the present bottleneck in collective negotiations. To accomplish this, wherever possible, potential areas of dispute as to whether an item is mandatorily negotiable must be eliminated. Expeditious judicial determination of any remaining areas of dispute must be accomplished. We therefore establish the following rules of law and procedure:

1.  In actions involving disputes as to whether proposals are mandatorily negotiable, the district court shall determine the matter in the same manner provided by the impasse procedure in K.S.A. 1978 Supp. 72-5426, which provides for a summary hearing commenced within five days, etc.

2.  The district court shall, in its determination, decide such negotiability questions as a matter of law. Ordinarily, evidence admitted should be only the proposals themselves, but the district judge may, in his discretion, permit such other evidence as will assist him in understanding the nature and effect of the proposal. The court will, of course, hear arguments of counsel and consider prior case law.

3.  The district court shall, whenever possible, determine the matter on the "topic" basis rather than on the nuances of the actual individual proposal. For example, this court held in *NEA-Topeka, Inc.,* 225 Kan. at 451, that class size was not negotiable. "Class size" is a topic and any particular proposal

to negotiate class size, regardless of its phraseology, is not mandatorily negotiable. As another example, "insurance benefits" is a topic statutorily made mandatorily negotiable and any particular proposal, regardless of its phraseology, is mandatorily negotiable unless excluded by the following portion of K.S.A. 1978 Supp. 72-5413(*l*):

> "Nothing in this act, or the act of which this section is amendatory, shall authorize the adjustment or, change of such matters which have been fixed by statute or by the constitution of this state."

The district court shall not be bound by the caption given the proposal in determining the negotiability question. If a particular proposal covers more than one subject, the district court may divide the proposal. Further, the district court may, where appropriate, conclude that a proposal which literally comes within a statutorily negotiable item is not included within the item because it goes beyond what was intended by the legislature to be included with the item. An example of this would be a proposal to require the Board to pay all teachers' wages in a lump sum to the Association and the Association would pay the teachers. This is technically a "wages" item, but goes far beyond what is intended for the item.

4. In determining a proposal sought to be made mandatorily negotiable under the "impact test" portion of K.S.A. 1978 Supp. 72-5413(*l*), the district court should consider (1) the nature of the mandatorily negotiable items specifically included in the statute; (2) that these specifically enumerated items relate directly to terms and conditions of professional service; (3) the fact that each of the specifically enumerated items would be equally appropriate to negotiations for factory workers, maintenance people, etc.; (4) that for any proposal to be made mandatorily negotiable under this test it should have a similar relationship to terms and conditions of professional service; and (5) that any such item should be a logical extension of the enumerated items and not an unauthorized invasion into the Board's policy-making duties and obligations.

We turn now to the particular proposals before us wherein we will apply the foregoing rules. The trial court found each of the proposals to be mandatorily negotiable. For simplification, we will use the word "negotiable" for mandatorily negotiable, and "non-negotiable" for not mandatorily negotiable. Also, for sim-

plification, "statutory item" refers to an item specifically listed in K.S.A. 1978 Supp. 72-5413(*l*).

1. NONDISCRIMINATION—Non-negotiable. The item is not a statutory item. The area is covered by other statutes (K.S.A. 1978 Supp. 72-5430[*b*][3] and [4], and K.S.A. 1978 Supp. 72-5436 *et seq.* [Teachers Due Process Act]), as well as other state and federal law.

2. ACADEMIC AND PERSONAL FREEDOM—Non-negotiable. This topic was one of the items rejected by this court in *Shawnee Mission.* The topic was not included in the statutory items. Also included in this topic from another proposal is freedom of expression and political activity.

3. ASSIGNMENT AND TRANSFER—Non-negotiable. Transfer was an item held negotiable in *Shawnee Mission,* but it was deleted by the legislature in listing the statutory items. Assignment is closely related thereto and a part of the same topic.

4. EXTRACURRICULAR COMPENSATION—Non-negotiable, unless the particular duty to be performed is expressly set forth in the individual teacher's primary contract. Otherwise, the topic is non-negotiable pursuant to K.S.A. 72-5412a (Supplemental Contracts).

5. REDUCTION IN PERSONNEL AND RECALL OF PERSONNEL—Non-negotiable, as determined in *NEA-Parsons v. U.S.D. No. 503,* 225 Kan. 581, 593 P.2d 414 (1979).

6. DISMISSAL PROCEDURES—Non-negotiable. Due Process Procedure is set forth in K.S.A. 1978 Supp. 72-5436 *et seq.* K.S.A. 1978 Supp. 72-5413(*l*) prohibits mandatory negotiation of items to adjust or change matters fixed by statute.

7. BINDING ARBITRATION OF GRIEVANCES—Non-negotiable. K.S.A. 72-5424 authorizes the inclusion of binding arbitration of grievances into negotiated contracts, but the topic itself is not mandatorily negotiable. The statute grants authority for such a provision if it is mutually agreed to be a negotiable item.

8. PROCEDURE FOR DISCIPLINE OF TEACHERS—Negotiable. "Disciplinary procedure" is a statutory item.

9. PROCEDURE FOR NONRENEWAL OF CONTRACTS—Non-negotiable. This is not a statutory item and the topic is covered by K.S.A. 1978 Supp. 72-5411 and the Due Process Act (K.S.A. 1978 Supp. 72-5436 *et seq.*).

10. PAY FOR UNUSED SICK LEAVE—Negotiable. Sick leave is a statutory item.

11. INSURANCE COVERAGE FOLLOWING "LAY-OFF"—Negotiable. Insurance is a statutory item.

12. WORKDAY (length of day, arrival and departure time, number of teaching periods, duty-free lunch period, and no custodial work)—Negotiable. Topic is included in statutory item, "hours and amounts of work."

13. FREQUENCY OF GRADE CARDS—Non-negotiable. This is not a statutory item and fails the impact test.

14. RESIDUAL RIGHTS FOR TEACHERS' WORK COPYRIGHTED AND SOLD BY THE SCHOOL DISTRICT—Non-negotiable. This is not a statutory item.

15. SUFFICIENT FUNDS FOR TEXTBOOKS AND SUPPLIES—Non-negotiable. This is not a statutory item and fails the impact test.

16. ASSOCIATION RIGHTS. In *NEA-Topeka, Inc.,* 225 Kan. 445, this topic was determined to be negotiable as applied to payroll deductions for association dues, transaction of association business during the school day (as more fully set forth in the opinion), leave pool for association business, use of inter-school mail system, and copies of negotiated agreements. These were held negotiable as being essential to the right of collective negotiations. We specifically limit this topic to those enunciated in *NEA-Topeka, Inc.* We hold the proposals herein, relating to inessential convenience benefits for association officers, such as a telephone for the president in the classroom, being first on the agenda at Board meetings, and requiring each principal, as well as the Board or its designee, to meet with association representatives at least once a month, are non-negotiable.

17. SABBATICAL LEAVE—Non-negotiable. There is a statutory item of "sick and other leave." We hold sabbatical leave is not the type of leave intended to be included therein. Under the maxim *noscitur a sociis* (it is known from its associates), the term "sick and other leave" should be read as having the same general qualities and characteristics as its fellow terms. See *NEA-Topeka, Inc.,* 225 Kan. at 453.

18. IN-SERVICE EDUCATION—Negotiable. The term is defined in K.S.A. 1978 Supp. 72-1106(*d*). The proposal is to establish a committee to make recommendations to the board as to in-service education. Under the impact test, the item is negotiable.

19. FORM OF INDIVIDUAL TEACHER CONTRACTS—Non-negotiable.

To require negotiation would defeat the statutory exclusion of supplemental contracts (K.S.A. 72-5412a) from collective negotiations. The form of the individual contract is for the Board to determine. The content of the individual contract, whatever its form, must not be in conflict with the negotiated agreement or statutory law.

We have determined all issues raised in this appeal. For the assistance of the parties in future negotiations, the following procedure is suggested:

1. Immediately after the exchange of proposals for negotiations (pursuant to K.S.A. 1978 Supp. 72-5423[a]), the parties should determine whether they are in agreement that all proposals are either mandatorily negotiable items or items on which the parties mutually agree they will negotiate (K.S.A. 1978 Supp. 72-5413[l]).

2. In making the above decision the parties should consider the rules set forth previously in this opinion as to a district court's determination of the scope of mandatory negotiations.

3. If the parties cannot agree that all proposals are negotiable (either mandatorily or by mutual agreement), then an action for declaratory judgment should be commenced forthwith in the district court for judicial determination of the matter in order that the parties may effectively proceed with their professional negotiations.

In conclusion, we note the district court made its determination herein on the hearing held on the motion to dismiss and the request for a temporary injunction. The matter of the writ of mandamus was left for further hearing and decision. The parties have treated the district court's decision as the final determination of the issues. As in *NEA-Topeka, Inc.*, 225 Kan. 445, the action, regardless of its caption, resulted in the issuance of a decision that was essentially a declaratory judgment. Under these circumstances no purpose is served by remanding the case.

The judgment is affirmed in part and reversed in part.

HERD, J., not participating.

PRAGER, J., concurs in the result.